IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 14, 2026

**STATE OF TENNESSEE v. OSCAR ROMERO**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2021-CR-1328     Robert T. Bateman, Judge**

———————————

**No. M2025-00777-CCA-R3-CD**

———————————

The Defendant, Oscar Romero, was convicted by a Montgomery County jury of rape, a Class B felony. *See* T.C.A. § 39-13-503 (2018) (subsequently amended). On appeal, he asserts that the proof is insufficient to sustain his conviction, that the trial court erred by excluding rebuttal evidence to impeach the victim, and that the court erred in its application of an enhancement factor during sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and STEVEN W. SWORD, JJ., joined.

John T. Maher, Clarksville, Tennessee, for the appellant, Oscar Romero.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and Christopher L. West, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction relates to the rape of a nineteen-year-old victim that occurred on December 26-27, 2020, after a party at the Defendant's house for the Defendant's stepdaughter.

At the trial, the victim testified that on December 26, 2020, she was age nineteen, lived with her parents, and attended a birthday party for her friend, Ms. Enriquez, who was the Defendant's stepdaughter. The victim said that Ms. Enriquez's cousin drove her from her house in Nashville to the party at the Defendant's house in Clarksville and that the victim was supposed to return home that same evening. The victim recalled that she arrived at the Defendant's house around 10:00 p.m. and that approximately twenty members of Ms. Enriquez's family were in attendance. The victim said that she had previously met the Defendant and identified him at the trial. The victim stated that Ms. Enriquez's mother, Maribel Paredes, offered the victim an alcoholic drink and that the victim did not eat any food during the party. The victim recalled that everybody continued drinking throughout the evening and that, around 11:00 p.m., she contacted her mother and asked if she could stay the night because Ms. Enriquez's cousin, who was supposed to drive the victim home, had been drinking alcohol. The victim said that her mother contacted Ms. Paredes and gave permission for her to stay the night. The victim said that over the course of the evening, guests left until only the victim, Ms. Enriquez, Ms. Paredes, the Defendant, and two other guests remained at the house.

The victim testified that she and Ms. Enriquez would "go out" about three weekends each month and would drink alcohol. The victim recalled that after drinking the alcoholic drink she was given when she arrived, she began drinking whiskey in a shot glass. The victim recalled that Ms. Paredes and other guests poured alcohol into shot glasses. The victim believed that she had more than three shot glasses of alcohol.

The victim testified that, during the party and while she was sitting in a chair at the kitchen counter, the Defendant "put his arm around [her] and grabbed [her] left breast" with his hand. The victim said that she did not want the Defendant to do this, and she left the kitchen and went to bed in Ms. Enriquez's bedroom. The victim said this happened while Ms. Enriquez, Ms. Paredes, and the other guests sang karaoke. The victim said that she did not mention this incident to anyone at the party because she was "in shock." The victim acknowledged that she was "pretty drunk" at the time and that she wanted to "sleep it off." The victim explained that the long side of Ms. Enriquez's bed was pushed against a window, that she slept on the side of the bed away from the window, and that she slept on her side with her face toward the window and her back toward the door. The victim believed she went to bed around 2:00 a.m. and set an alarm for 10:00 a.m. The victim recalled that she went to bed wearing a black, braless top, underwear, and white jeans and that she lay on top of the covers. The victim said that she closed the bedroom door after entering the bedroom, that it was dark, and that she was alone when she went to bed. The victim stated that she did not recall Ms. Enriquez entering the bedroom.

The victim testified that she awoke "feeling [the Defendant] behind me." The victim explained that she felt a man "thrusting himself against [her]" and that he had his "private part" in her vagina. The victim said that she tried but was unable to wake

completely and fell unconscious. The victim said she "just had a feeling" that the man in bed with her was the Defendant. The victim acknowledged that she did not know whether the man ejaculated. The victim said that Ms. Enriquez was asleep on the bed to the victim's right and on the side of the bed that was closer to the window. The victim recalled waking up again during the night and hearing an argument before falling asleep. The victim said she could not determine who argued. The victim said that when she awoke from her alarm, Ms. Enriquez was beside her in the bed on the victim's left side and that Ms. Enriquez's mother and younger sister were sleeping on the bedroom floor. The victim stated that Ms. Enriquez's mother and sister had not been sleeping on the floor when the victim awoke earlier and heard an argument.

The victim testified that when she awoke at 10:00 a.m., her underwear was "rolled" and her pants were unzipped and "sort of down." The victim recalled that her pants had been zipped when she went to bed. The victim said that the state of her clothes led her to believe that someone had "messed with them" and that feeling a man behind her had not been a dream. The victim said that the Defendant entered the bedroom and asked how she and Ms. Enriquez slept. The victim stated that she was scared to acknowledge that she was aware something had happened and pretended everything was "okay." The victim said that Ms. Enriquez "just looked down the whole time." The victim acknowledged that she did not tell anyone about what happened because she felt she could not trust Ms. Enriquez's family. The victim said that Ms. Enriquez's cousin gave her a ride home and that during the ride, she felt like crying and remained silent. The victim said that during the ride she sent a text message to her boss regarding what had happened and told her boss that she would miss work. The victim recalled arriving at her house around noon on December 27, 2020.

The victim testified that after arriving at her house, she told her sister what had happened and that they went to the hospital, where a nurse performed a sexual assault examination. The exam included swabs of the victim's vagina. The victim said that she did not report the assault to the police on the day she visited the hospital but that she reported it to the police two days later, after telling her mother. The victim recalled giving a statement to the police. The victim said that she did not want to have sexual intercourse with the Defendant, that she did not flirt with the Defendant or indicate she wanted to have sex with him, and that she never told anyone that she wanted to have sex with him.

The victim testified that, after the incident, the Defendant attempted to send her messages on Facebook which she did not open, and she later blocked his messages. The victim stated that she had not been friends on Facebook with the Defendant and that she "didn't want anything to do with him." The victim said that the messages sent by the Defendant were later "unsent" by the Defendant. A screenshot of the Defendant's Facebook profile showing sent and unsent messages was received as an exhibit. The

victim stated that she blocked Facebook messages from Ms. Enriquez and that she and Ms. Enriquez "eventually" stopped staying in contact with each other.

On cross-examination, the victim testified that, initially, she planned to stay at Ms. Enriquez's party for about an hour, that she planned to drink alcohol, and that she believed Ms. Enriquez's cousin could drive her home. The victim recalled that the dancing and karaoke lasted approximately three hours and that she recorded videos and sent text messages. The victim, however, acknowledged that she did not have a copy of the recordings or messages. The victim stated that after going to bed, she did not remember Ms. Enriquez, Ms. Paredes, or Ms. Enriquez's sister entering the bedroom. The victim said she did not recall telling the nurse or the police officer that the Defendant left Ms. Enriquez's bedroom after Ms. Enriquez asked him to leave. The victim said that she did not recall any time after going out and drinking alcohol when she took off her clothes or sent a text message to her boss's husband. The victim did not recall Ms. Enriquez ever telling the victim that the victim had done those things.

The victim testified that she contacted the police by telephone. The victim said that she did not recall telling the nurse that she lay on her stomach when she was raped, nor did she recall a police officer asking her about whether she was lying on her stomach or her side. The victim recalled one police interview and then later telephone calls. The victim recalled that she was alone when she first went to sleep in the bedroom, that Ms. Enriquez was asleep on the victim's right when the victim woke during the incident, and that when the victim woke from her alarm, Ms. Enriquez was asleep on the victim's left, where the Defendant had been. The victim acknowledged that she had no "issues" with the Defendant during the previous three or four times she had been around the Defendant.

The victim's sister testified that in December 2020, she was age fifteen and lived in Nashville with her parents and siblings, including the victim. The victim's sister recalled receiving a telephone call from the victim on the morning of December 27 and that the victim sounded upset. The victim's sister said the victim went straight to the victim's bedroom upon arriving home. The victim's sister recalled talking to the victim but said that the victim did not talk to their parents. The victim's sister said that, on December 27, she accompanied the victim to the hospital and that the victim appeared angry. The victim's sister said that when she joined the victim in the hospital room, the victim was crying, which was unusual. The victim's sister stated that upon returning home, the victim began sleeping in the victim's sister's bedroom instead of the victim's bedroom. On cross-examination, the victim's sister acknowledged that she did not attend Ms. Enriquez's party or know the Defendant.

The victim's mother testified that she had met Ms. Enriquez and Ms. Paredes prior to Ms. Enriquez's party and that the victim had asked permission to attend Ms. Enriquez's party. The victim's mother recalled that she was hesitant to allow the victim

to attend because the party was far from Nashville but that she agreed because the victim was supposed to return home the same night. The victim's mother said that she agreed to allow the victim to spend the night at Ms. Enriquez's house only after Ms. Paredes sent her a text message asking if the victim could stay. The victim's mother said that she was not at home when the victim returned home and that when she saw the victim the next day, December 28, the victim "looked strange" and "was shut up in her room." The victim's mother said that on December 29, the victim told her what happened at Ms. Enriquez's house, that she told the victim to contact the police, and that the victim spoke to a detective. The victim's mother stated that she helped the victim begin counseling. On cross-examination, the victim's mother said that she has had no contact with the Defendant.

Meredith Boggs, a nurse and expert in the area of sexual assault examination, testified that on the afternoon of December 27, 2020, she performed an examination of the victim at the Vanderbilt Medical Center. Ms. Boggs said that she began the examination by obtaining the victim's medical history and obtaining any other information that could affect the collection of DNA evidence. Ms. Boggs stated that the victim had not showered or changed her underwear. Ms. Boggs said that the victim related that she had been at a friend's party and had been drinking alcohol, that she went to bed fully clothed, that she awoke feeling "someone was behind [her] going inside of [her]" and touching her breast, and that her friend awoke and yelled at "this person" to get out. Ms. Boggs recalled that the victim said she was unsure whether the person ejaculated. Ms. Boggs said the victim did not disclose the name of her assailant.

Ms. Boggs testified that she examined the victim for any injuries and collected swabs for DNA evidence, including swabs of the victim's vaginal area, and the victim's underwear. Ms. Boggs said that the victim's vaginal area was not injured and that such a finding was not unusual in sexual assault cases. Ms. Boggs did not take photographs because the victim declined to be photographed. Ms. Boggs explained that the swabs and underwear were sent to a laboratory for DNA testing. The sexual assault kit containing evidence collected from the victim was received as an exhibit.

Officer Brittney Honeycutt testified that she spoke to the victim by telephone and that the victim reported being sexually assaulted by the Defendant at the Defendant's house.

Clarksville Police Department (CPD) Sergeant Sean Walden testified that, in December 2020, he was a detective with the special victims unit and, on January 7, 2021, he interviewed the victim at the CPD office. Sergeant Walden stated that on January 8, he went to the Defendant's house, that he was unable to locate the Defendant, and that he left a contact card. Sergeant Walden said that he received a telephone call from Ms. Enriquez and that he spoke to Ms. Enriquez and Ms. Paredes. Sergeant Walden recalled

that the Defendant provided a DNA sample and that Sergeant Walden submitted the Defendant's sample and the victim's sexual assault kit to the Tennessee Bureau of Investigation (TBI) for testing.

On cross-examination, Sergeant Walden testified that during his interview of the victim, she indicated that she "was not falling down drunk" at Ms. Enriquez's party and that she and Ms. Enriquez went together into the bedroom. Sergeant Walden recalled that the victim described the Defendant as being on top of her and also behind her. Sergeant Walden said that after talking to the victim a second time, he concluded the victim believed that the Defendant was behind her during the incident and that Ms. Enriquez knew that something had happened and that Ms. Enriquez had walked with the Defendant out of the bedroom. Sergeant Walden stated that he never received Snapchat video recordings from Ms. Enriquez, although she had mentioned that they existed.

Laura Boos, a former special agent forensic scientist with the TBI and a forensic biology expert, testified that she analyzed evidence collected from the victim and the Defendant. Ms. Boos stated that the victim's vaginal swabs contained sperm cells, for which she developed a DNA profile. Ms. Boos said that she also obtained DNA profiles from the Defendant's and the victim's buccal swabs. Ms. Boos stated that the evidence obtained from the victim's vaginal swabs contained DNA from both the victim and the Defendant. Ms. Boos explained that "no one other than [the Defendant] could be the source of that DNA profile with the exception of an identical twin." Ms. Boos said that TBI policy dictated that if tests of a victim's "most intimate items," such as the victim's vaginal swabs, show a DNA match, then testing of additional items was unnecessary. Ms. Boos's forensic report was received as an exhibit.

The State concluded its proof.

Outside the presence of the jury, the trial court heard testimony from Ms. Enriquez that rebutted the victim's testimony regarding past instances when the victim forgot events after becoming intoxicated. Ms. Enriquez testified that sometimes when she and the victim went out and drank alcohol, the next morning the victim could not recall what the victim did the prior evening. Ms. Enriquez said this happened two or three times. Ms. Enriquez recalled a time when the victim texted her boss's husband, another time when the victim began "acting weird" and "touching herself," and a third time when the victim tried to kiss Ms. Enriquez. Ms. Enriquez stated that she told the victim about what the victim did on those three occasions, but that the victim did not have any recollection of doing those things.

The parties agreed that the incident involving the victim trying to kiss Ms. Enriquez was excluded by Tennessee Evidence Rule 412. The defense argued that the remaining rebuttal evidence was admissible to prove the victim was not truthful during

her testimony. The State noted that the victim was never asked about touching herself and that sending a text message was not relevant or unusual behavior. The State also argued that this evidence was excluded by Tennessee Evidence Rule 608(b). The court held that the rebuttal evidence regarding the victim's touching herself and trying to kiss Ms. Enriquez was sexual in nature and barred by Tennessee Evidence Rule 412. The court noted that the Defendant had failed to provide any notice or to request a hearing before using this evidence as required by Rule 412. The court determined that the victim's text message "could be an [a]llusion to sexual impropriety," and, thus, also was barred by Rule 412. Additionally, the court found the evidence regarding the text message to be irrelevant and, even if relevant, the potential for undue prejudice outweighed any relevance. The jury returned to the courtroom.

Ms. Enriquez testified for the defense that she lived in Clarksville with her mother, sister, and the Defendant and that she and her family lived in Nashville before moving to Clarksville. Ms. Enriquez said that she had a birthday party in December 2020, to which she invited her family, extended family, and the victim, with whom she had been friends for two years. Ms. Enriquez recalled that her cousin drove the victim to the party and that it was the first time the victim had been to Ms. Enriquez's house in Clarksville. Ms. Enriquez believed the victim arrived at the party around 8 p.m. Ms. Enriquez said that alcoholic beverages were served at the party and that people danced and sang karaoke. Ms. Enriquez said that she went with the victim to the bedroom and that they recorded videos for and looked at social media before going to sleep. Two Snapchat video recordings, one showing a time of 4:23 a.m. and the other of 4:26 a.m. on December 27, 2020, showed Ms. Enriquez and the victim in Ms. Enriquez's bedroom, and were received as exhibits. Ms. Enriquez stated that she and the victim went to sleep after recording the videos and that the only other people in the bedroom were Ms. Enriquez's mother and sister, who slept on the floor next to the bed. Ms. Enriquez said her bedroom door opened into the room and that birthday presents were on the floor near the door, which the door touched when it opened. Ms. Enriquez recalled that she was not disturbed during the night by noise or movement, that her mother woke her the next morning around 9:00 a.m. or 10:00 a.m., and that the victim and Ms. Enriquez's sister were still asleep when Ms. Enriquez awoke. Ms. Enriquez stated that when she awoke, she was in the same position on the bed near the window as when she went to sleep. Ms. Enriquez said that the victim asked to borrow clothes to wear to work and seemed "fine." Ms. Enriquez recalled that the victim slept under the bed covers. Ms. Enriquez stated that the Defendant was in the kitchen with her cousin when she went to sleep and that he was in the living room the next morning. Ms. Enriquez acknowledged that she did not have any contact with the victim after the morning of December 27 except that Ms. Enriquez sent the victim a text message after Ms. Enriquez was contacted by a police investigator, to which the victim did not respond. Ms. Enriquez stated that she was certain that, on December 27, the Defendant did not enter or need to be escorted out of her bedroom.

On cross-examination, Ms. Enriquez testified that she told the investigator that she and the victim went to bed between 3:00 a.m. and 4:00 a.m. and acknowledged that video recordings could be posted to social media at a time later than when they were recorded. Ms. Enriquez said that she was age nineteen on December 26, 2020, that she began drinking tequila that night around 8:00 p.m., and that she described herself to Detective Walden as being "wasted" during the party. Ms. Enriquez explained that around midnight she and other guests began dancing and singing karaoke. Ms. Enriquez estimated that she consumed five or six shots of tequila. Ms. Enriquez acknowledged that the Defendant was her stepfather and that she had lived with him for approximately eight or nine years.

On redirect examination, Ms. Enriquez testified that the Defendant no longer lived with her and her mother and that she did not want to have any contact with the Defendant "because of how much he hurt my mom and sister," which Ms. Enriquez attributed to financial issues.

Maribel Paredes testified that the victim and her daughter, Ms. Enriquez, were friends and drank tequila during the party. Ms. Paredes said that she did not notice any interaction between the victim and the Defendant during the party, that she was the last to go to bed, and that the victim and Ms. Enriquez went to bed around 3:45 a.m. Ms. Paredes explained that she, the victim, Ms. Enriquez, and Ms. Enriquez's sister slept in Ms. Enriquez's bedroom, that the Defendant and Ms. Enriquez's cousin slept on the floor in the living room, and that two other guests slept in Ms. Paredes's bedroom. Ms. Paredes said she and Ms. Enriquez's sister slept on the floor. Ms. Paredes recalled that her feet touched Ms. Enriquez's bedroom door when she fell asleep and that she slept through the night until the victim's alarm woke her. Ms. Paredes explained that she then woke Ms. Enriquez and that Ms. Enriquez woke the victim. Ms. Paredes recalled that the victim slept on the side of the bed next to the window and that Ms. Enriquez slept on the side of the bed closer to the door.

On cross-examination, Ms. Paredes testified that she, Ms. Enriquez, and the victim drank alcohol but that she did not recall whether someone gave the victim a bottle of whiskey. Ms. Paredes said that Ms. Enriquez's cousin was age seventeen at the time of the party. Ms. Paredes said that when party guests began to leave, she told Ms. Enriquez and the victim to stop drinking alcohol and to go to bed. Ms. Paredes acknowledged that she told Detective Walden that the victim and Ms. Enriquez went to bed between 2:30 a.m. and 3:00 a.m. and that she went to bed around 3:45 a.m. Ms. Paredes explained that her house had three bedrooms and that no one slept in Ms. Enriquez's sister's bedroom. Ms. Paredes said that she told Ms. Enriquez's cousin to sleep there but that he slept on the living room floor.

Ms. Enriquez's cousin testified that he drove the victim to Ms. Enriquez's party and that he and the Defendant were the last to go to sleep on the floor in the living room. Ms. Enriquez's cousin said that on December 27, 2020, Ms. Paredes woke him and that he drove the victim home. He said the victim seemed normal. On cross-examination, Ms. Enriquez's cousin said that he and the Defendant were the last to go to sleep around 5:00 a.m. and that he "kn[e]w for sure [Ms. Enriquez's sister] was sleeping in her room."

The Defendant elected not to testify.

The jury found the Defendant guilty of one count of rape.

At the sentencing hearing, the presentence report was received as an exhibit. It reflected that the Defendant was age forty-two at the time of the offense, that he attended school in Mexico, and that he completed additional education through the eighth grade in the United States. The Defendant had no prior criminal history. The Defendant reported that his mental health was good, that his physical health was fair, and that he took sleep medication. The Defendant acknowledged that he was intoxicated on the night of the offense but denied that he was dependent on alcohol. The Defendant reported illegally entering the United States when he was age sixteen or seventeen, that his father was deceased, and that his mother had just obtained a visa to travel to the United States. The Defendant reported that, as a child, he was sexually abused by a relative. The Defendant said that he had been married to Ms. Paredes for ten years, that they had a daughter together, and that he had a stepdaughter, Ms. Enriquez. The Defendant also reported a son who lived in Mexico. The Defendant stated that he had a good relationship with his wife and daughter but that he no longer had contact with Ms. Enriquez. The Defendant's prior employment included construction work. The Strong-R Risk and Needs Assessment reflected that the Defendant had a low risk to reoffend and a high or moderate need for education and residential assistance.

The trial court also received victim impact statements from the victim and the victim's sister. The victim wrote that she "will never be the same after this" and that her sister and mother also "suffered greatly." She wrote that she was diagnosed with post-traumatic stress disorder and depression. She wrote that she engaged in destructive behavior and that her grades fell. She described the rape as affecting her "relationships, health, and enjoyment of life." She wrote that she pushed away her friends and family and sought therapy and that she had feelings of "guilt, despair, and disgust" and suicidal ideations. She described living with trauma as a "day-to-day battle." She requested that the court order the Defendant to serve a maximum sentence. Likewise, the victim's sister described the torment she and the victim experienced as a result of the rape.

Ms. Paredes testified that she had known the Defendant for eleven years, and she described him as a good man who never had engaged in criminal behavior. Ms. Paredes

-9-

said that the Defendant had been a good provider and a loving father. Juana Romero, the Defendant's sister, testified that the Defendant was hardworking and responsible and that he never had been in trouble during the fifteen years he had lived in Tennessee.

The State argued that enhancement factors applied because the victim was particularly vulnerable at the time of the rape due to intoxication, that the Defendant admitted he was unlawfully in the United States, and that the Defendant reported frequently using alcohol and being intoxicated on the night of the offense. *See* T.C.A. § 40-35-114 (2019) (subsequently amended). The State requested an eleven-year sentence. The Defendant argued that the victim's incapacitation was an essential element of the crime and should not be considered as an enhancement factor. The Defendant, requesting that the court order the minimum sentence, also argued that his citizenship status had not been adjudicated, that he had no criminal history, that he had strong ties to the community, and that the presentence report found he had a low likelihood of recidivism. The State further noted that the Defendant was charged with rape due to the victim's lack of consent, not that the victim was incapacitated.

The trial court found that the Defendant was a Range I offender[1] and not a favorable candidate for alternative sentencing pursuant to the relevant alternative sentencing factors. The court applied three enhancement factors. *See* T.C.A. § 40-35-114 (2019). The court applied enhancement factor (4), that the victim was particularly vulnerable because of age or disability, because of the "vast difference" in age between the victim and Defendant. *Id.* § 40-35-114(4). The court applied enhancement factor (7), that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement. *Id.* § 40-35-114(7). Additionally, the court applied enhancement factor (28), that the Defendant was unlawfully in the United States when the offense was committed, based upon the presentence report and the Defendant's admission to being in the United States unlawfully. *Id.* § 40-35-114(28). The court determined that no mitigating factors were applicable. *See id.* § 40-35-113 (2019) (subsequently amended). The court ordered the Defendant to serve a ten-year sentence in confinement.

The Defendant filed a motion for new trial contending that the trial court erred by excluding rebuttal evidence to impeach the victim's credibility. The Defendant also filed a renewed motion for judgment of acquittal and a motion to modify his sentence. The court, after a hearing, denied the Defendant's motions. This appeal followed.

---

[1] The current rape statute requires that a defendant convicted of rape receive a sentence as, at least, a Range II offender. *Compare* T.C.A. § 39-13-503(b)(2) (2025), *with* § 39-13-503(b) (2018) (subsequently amended).

The Defendant contends that the trial evidence is insufficient to support the conviction, that the trial court erred by excluding rebuttal evidence to impeach the victim, and that the court abused its discretion in sentencing by considering the age difference between the victim and the Defendant as an enhancement factor. The State counters that the evidence is sufficient to support the conviction, that the court did not err by excluding rebuttal evidence, and that the court did not abuse its discretion in sentencing.

# I

## Sufficiency of the Evidence

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"It is well established that the identity of the perpetrator is an essential element of any crime." *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). We apply the same standard of review, whether the evidence is direct or circumstantial. *Dorantes*, 331 S.W.3d at 379.

As relevant to the Defendant's appeal, rape is the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim . . . without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that

the victim did not consent[.]" T.C.A. § 39-13-503(a)(2) (2018) (subsequently amended). Sexual penetration is defined as

> sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]

*Id.* § 39-13-501(7) (2025).

Here, the victim testified that she went to bed and then woke to feel a man behind her thrusting his penis into her vagina. Swabs of the victim's vagina contained evidence of semen and the Defendant's DNA. The victim testified that she did not consent to have sex with the Defendant. The victim's conduct after the incident was consistent with the behavior of a victim processing a sexual assault. The victim testified that she left Ms. Enriquez's house without confronting anyone, that she went to the hospital for an examination shortly after arriving home, that she disclosed the assault to her mother and sister, and that two days later she reported the assault to law enforcement. Although witnesses at the trial provided conflicting testimony regarding whether the Defendant entered the bedroom where the victim was sleeping, the jury resolved this conflict by crediting the victim's testimony. The Defendant's conviction is further supported by the DNA evidence. Viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could have found the essential elements of rape beyond a reasonable doubt. The Defendant is not entitled to relief on this basis.

## II

### Exclusion of Evidence to Impeach the Victim

The Defendant contends that the trial court erred by excluding evidence to impeach the victim's credibility. Specifically, the Defendant sought to introduce evidence that on two occasions the victim forgot things she did when she was intoxicated. The first instance regarded a time when the victim was alleged to have sent a text message to her boss's husband. The second instance regarded a time when the victim was alleged to have acted "irrationally" and began touching herself. The Defendant asked the victim about these alleged occurrences during cross-examination, and the victim said she did not remember the incidents and generally denied that they occurred. The Defendant sought to introduce Ms. Enriquez's testimony to rebut the reliability of the victim's recollection. The Defendant relies on Tennessee Rule of Evidence 611(a) in this regard. The State relies upon the Defendant's failure to comply with the conditions of Tennessee Rule of Evidence 412 and the evidence's failure to meet the relevance

requirement of Tennessee Rule of Evidence 401.[2]  The following exchange occurred during cross-examination of the victim:

> [Defense Counsel]: Do you remember . . . going out and drinking with [Ms. Enriquez] before, and waking up in the morning and having them tell you you did something and you didn't recall it?
>
> . . . .
>
> [Victim]: No.
>
> [Defense Counsel]: Do you remember an incident where you were taking off your clothes in the house?
>
> [Victim]: No.
>
> [Defense Counsel]: And you don't recall it?
>
> [Victim]: No.
>
> [Defense Counsel]: And [Ms. Enriquez] told you the next day?
>
> [Victim]: No.
>
> [Defense Counsel]: Do you recall texting your boss's husband –
>
> [Victim]: No.
>
> [Defense Counsel]: -- when you guys were out drinking?
>
> [Victim]: No.
>
> [Defense Counsel]: And telling [Ms. Enriquez] about it the next morning?

---

[2] The State, in the trial court, relied on Tennessee Rule of Evidence 608(b), in addition to Tennessee Rule of Evidence 412 to exclude the evidence.  Rule 608(b) provides that "[s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness or untruthfulness . . . may not be proved by extrinsic evidence."  The trial court did not rule on the applicability of Rule 608(b) to the exclusion of the evidence of Ms. Enriquez's proffered testimony, and neither party addresses the rule on appeal.

[Victim]: No.

[Defense Counsel]: Couldn't believe you did it?

[Victim]: No.

[Defense Counsel]: You don't think any of those things ever happened?

[Victim]: No.

In a hearing outside the presence of the jury, the trial court considered whether the Defendant could offer Ms. Enriquez's testimony to impeach. Ms. Enriquez testified that the victim, when she was intoxicated, sent a text message to the victim's boss's husband. Ms. Enriquez said she did not recall the contents of the victim's text message. Ms. Enriquez also testified that, on another occasion, the victim, who was intoxicated, began "touching herself" but did not recall it the next morning. The court held that the testimony regarding the victim's touching herself was sexual in nature and was prohibited by Tennessee Rule of Evidence 412. The court also found that the text message to the victim's boss's husband was "an [a]llusion to [the victim's] sexual impropriety" and, likewise, was prohibited Rule 412. The court noted that the parties entered an agreed order providing that evidence of the victim's prior sexual behavior would not be allowed at the trial. The court also noted that the Defendant provided no prior notice to the court of his intent to use this evidence, as required by Rule 412. Additionally, the court found the evidence regarding the text message to be irrelevant and, alternatively, that the potential for undue prejudice substantially outweighed any relevance. *See* Tenn. R. Evid. 401, 403.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 412 provides that although evidence of reputation or opinion evidence of a victim's sexual behavior or evidence of sexual behavior with an individual other than the defendant is generally inadmissible, it may be admissible in limited circumstances. Tenn. R. Evid. 412(c)(4). In order for the evidence to be admitted, a motion complying with certain requisites must be filed, and the trial court must determine at a hearing that the evidence relates to reputation or opinion regarding the victim's sexual behavior or is evidence of sexual behavior with someone other than the defendant and is offered to rebut scientific or medical evidence. *Id.* 412(d). The court must also determine that the probative value of the evidence of the evidence outweighs its unfair prejudice to the victim. *Id.* 412(d)(4).

Tennessee Rule of Evidence 611(a) provides that "[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Whereas the court has the essential responsibility to "control the flow of evidence to the jury by ruling on the admissibility of evidence[,]" Rule 611(a) gives the court "discretion to prevent lawyer misconduct." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702, 708 (Tenn. Ct. App. 1999). "[T]he propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993).

In the present case, the trial court concluded that the impeachment evidence that the victim "touched" herself was sexual in nature and excluded pursuant to Rule 412. Tenn. R. Evid. 412. The record reflects that the parties entered an agreed order that evidence of the victim's prior sexual behavior would not be allowed at the trial. It further reflects that the Defendant provided no prior notice to the court of his intent to use this evidence as required by Rule 412. The court did not abuse its discretion by excluding this evidence pursuant to Rule 412.

The court also concluded that evidence regarding the victim's text message to her boss's husband could be "an [a]llusion to [the victim's] sexual impropriety" and should be excluded pursuant to Rule 412. It is unclear whether this evidence is excludable pursuant to Rule 412 because no record exists regarding whether the substance of the text message was sexual in nature. However, the trial court did not abuse its discretion by excluding this evidence pursuant to Tennessee Rules of Evidence 401. The victim testified that she was intoxicated during that evening. Although she did not recall much of what happened to her after she went to bed, she recalled waking in the night to feel the Defendant thrusting his penis into her vagina, an act to which she testified that she did not consent. Because the victim testified that she remembered the incident, Ms.

Enriquez's proffered testimony that the victim allegedly had drinking-induced memory loss on a different occasion had no tendency to make the existence of any fact that is of consequence to the determination of the victim's recollection in this case more probable or less probable than it would have been without the evidence. *See* Tenn. R. Evid. 401. We also note that the State's evidence was strong, including both testimonial and DNA evidence. The court did not abuse its discretion by excluding this evidence. The Defendant is not entitled to relief on this basis.

## III

### Sentencing

The Defendant contends that the trial court erred by considering the age difference between the victim and the Defendant as a sentencing enhancement factor.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2025), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919, 920 (Tenn. Crim. App. 1987); *see* T.C.A. § 40-35-102 (2025).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The Defendant does not contest that he is a Range I offender who was found guilty of a Class B felony. *See* T.C.A. §§ 40-35-105; 39-13-502(b)(1)(A). Tennessee Code Annotated section 40-35-112(a)(2) (2025) provided that the Defendant's sentencing

range was "not less than eight (8) nor more than twelve (12) years." The trial court ordered the Defendant to serve a within-range, ten-year sentence. Because the court considered the appropriate purposes and principles of the Sentencing Act and ordered the Defendant to serve a within-range sentence, the court's sentencing determination is accorded a presumption of reasonableness.

The trial court applied enhancement factor (4), that the victim was particularly vulnerable because of age or physical or mental disability. The court found this factor applied because of the age difference between the victim, age nineteen, and the Defendant, age forty-two. *Id.* § 40-35-114(4). The Defendant contends that the court erred by applying this enhancement factor. The State noted that this factor was applicable because the victim was vulnerable due to her intoxication. The court did not address the victim's intoxication as a basis for applying enhancement factor (4). We agree with the Defendant that the court misapplied this enhancement factor if it was based solely on an age difference. However, the misapplication of an enhancement factor does not invalidate the sentence imposed unless the court wholly departed from the Sentencing Act. *Bise*, 380 S.W.3d at 706. The Defendant does not contest the application of enhancement factors (7) and (28). *See* T.C.A. §§ 40-35-114 (7) ("The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement[.]"); 40-35-114 (28) ("At the time the instant offense was committed, the defendant was illegally or unlawfully in the United States[.]") The court considered the appropriate purposes and principles of sentencing and ordered the Defendant to serve a within-range, ten-year sentence, which is two years less than the maximum sentence for a Range I offender convicted of a Class B felony. Accordingly, the court did not abuse its discretion in sentencing the Defendant. *Bise*, 380 S.W.3d at 706. The Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

**s/Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE